UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Dr. Samir Hamada,

               Plaintiff,

           v.

State University of New York at
Farmingdale,

               Defendant.

23-cv-6786 (NRM) (SIL)

**MEMORANDUM AND ORDER**

NINA R. MORRISON, United States District Judge:

Plaintiff Dr. Samir Hamada brings this action under Title VII of the Civil Rights Act of 1964 against Defendant State University of New York (SUNY) at Farmingdale.  His causes of action against Defendant are for (1) discrimination on a protected identity, (2) retaliation for Plaintiff's opposition to unlawful employment practices, and (3) creating a hostile workplace environment.  Compl. at 8–10, ECF No. 1.  Hamada also appears to allege a claim for (4) constructive discharge. Defendant SUNY at Farmingdale moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

For the reasons discussed below, the Court denies Defendant's motion to dismiss Hamada's Title VII claims for discrimination and retaliation and grants Defendant's motion to dismiss Hamada's Title VII claim alleging a hostile work environment and the apparent claim alleging constructive discharge.

## FACTUAL BACKGROUND

Plaintiff Dr. Samir Hamada's Complaint asserts the following facts, which the Court must accept as true for purposes of Defendant's motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Hamada was employed by Defendant State University of New York (SUNY) at Farmingdale in 2017 as an Assistant Professor in the Computer Systems Department housed within the School of Business. Compl. ¶ 11. Hamada identifies as an Egyptian and Muslim male. *Id.* ¶ 7. A year after Hamada began working at SUNY Farmingdale, the university hired Dr. Zhao. *Id.* ¶ 13. The Court infers from Hamada's Complaint that Dr. Zhao is female. *See id.* ¶¶ 13, 19, 25. Zhao and Hamada were employed "in equivalent tenure-track positions" and were "peer[s]." *Id.* ¶¶ 13–14.

On or about December 3, 2020, the Chair of the Computer Systems Department, Jill O'Sullivan, appointed Hamada and Zhao to be co-chairs of the "Self-Study Committee 2022." *Id.* ¶ 16, 18. As Hamada and Zhao began working together as co-chairs, Zhao relegated Hamada to a secondary role and made decisions without consulting him. *Id.* ¶ 19. Hamada asked Zhao to consult with him and communicated a desire to work as a team, but Zhao responded, "You are a male from the Middle East, and I know this culture very well." *Id.* ¶ 20. On or about April 29, 2021, Zhao shouted at Hamada during a committee meeting and criticized Hamada's work. Zhao stated, "I'm going to kick you out of this Committee!" and stormed out. *Id.* ¶ 26. Zhao then went to O'Sullivan to complain that Plaintiff was difficult to work with. *Id.* ¶ 27.

The next day, April 30, 2021, O'Sullivan held a meeting to resolve the dispute, but Zhao did not show. *Id.* ¶ 29. In the meeting with O'Sullivan, Hamada "expressed his dissatisfaction with the way he was being treated." Pl. Opp. to Def.'s Mot. to Dismiss ("Pl. Opp.") 11, ECF No. 14. O'Sullivan then removed Hamada from the committee and relegated him to a "support role." Compl. ¶ 30. Shortly after being removed from the committee, Plaintiff went to the emergency room. *Id.* ¶ 32.

After Hamada's visit to the emergency room, O'Sullivan convened a second meeting, via a virtual platform, with Hamada and Zhao. *Id.* ¶ 33. O'Sullivan "stood by her decision to remove Hamada from the Committee and make Zhao the sole chairperson." *Id.* In the meeting, O'Sullivan told Hamada "[i]f you go to the Dean with this issue, I will never, ever put you on a committee again." *Id.* ¶ 34. Apparently in the same meeting, O'Sullivan also told Plaintiff, "Samir do me a favor, go to the dean, he is going to be really tired of your garbage right now okay, and he will tell me to dissolve the committee and start a new one, and you know what I will have Zhao in that committee." *Id.* ¶ 35. After O'Sullivan left the meeting, Zhao stated, "You need to have a right attitude, not because you're a male"; and "I notice that you . . . it's probably your culture. I understand Middle Eastern culture, Samir. I totally do. You have this macho thing deeply ingrained in you. There is some power struggle in your mind[.]" *Id.* ¶ 36.

Hamada reported Zhao's comments to O'Sullivan and to the Dean of the School of Business, Richard Vogel on May 11, 2021. *Id.* ¶ 38. Hamada writes that "[o]n about May 11, 20211, (sic) O'Sullivan removed Plaintiff as co-chair of the committee."

3

*Id.* ¶ 41.  It is unclear from Plaintiff's Complaint whether O'Sullivan removed him as co-chair before or after he reported Zhao's comments to Dean Vogel.

Two days later, on May 13, 2021, Hamada reported his complaints to the university's human resources department.  *Id.* ¶ 39.  O'Sullivan "removed Plaintiff from all email communications regarding the committee which further impacted his ability to do his job."  *Id.* ¶ 42.  It is unclear when precisely that occurred, but Plaintiff alleges that the removal from email communications was "an act of retaliation caused by Plaintiff's discrimination complaint on May 13, 2021."  *Id.* ¶ 43.

In June 2021, Hamada began to seek mental health assistance.  *Id.* ¶ 44. Hamada alleges O'Sullivan refused to complete Hamada's annual report unless he agreed to remove an entry regarding a Cyber Advising Committee (a different committee from the one Plaintiff previously co-chaired with Zhao), refused to approve an online course Plaintiff developed that already had approval from "Distance Learning," and communicated with Plaintiff in a "harsh, hostile, and inappropriately critical manner."  *Id.* ¶ 45.  Hamada had stents placed in his heart on January 3, 2022.  *Id.* ¶ 49.

Hamada alleges that in August 2022, he was "forced to resign."  *Id.* ¶ 46; *see also* Pl. Opp., at 5 n.1.[1]  He started a new job with a lower salary and had to restart his tenure process at the new institution.  Compl. ¶ 47.

---

[1] Plaintiff had a typo in his Complaint, which stated he resigned in August 2021; Plaintiff clarified in his Opposition to the Motion to Dismiss that he resigned in August 2022.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts "must construe [a complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021). However, courts must also "disregard conclusory allegations, such as 'formulaic recitation[s] of the elements of a cause of action.'" *Id.* at 107 (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

Hamada has sufficiently pled claims for relief based on discrimination and retaliation under Title VII, but he has failed to adequately allege that he was subjected to a hostile work environment or constructive discharge.

## I.    Hamada has sufficiently pled a discrimination claim under Title VII

"[F]or a discrimination claim to survive a motion to dismiss, 'absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff [(1)] is a member of a protected class, [(2)] was qualified, [(3)] suffered an adverse employment action, and [(4)] has at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015)). There is no dispute that Hamada is (1) a member of a

protected class and (2) was qualified.  Instead, the parties dispute whether Hamada (3) suffered an adverse employment action and (4) has at least minimal support for the proposition that any adverse action taken by his employer was motivated by discriminatory intent.

## a. Adverse employment action

Hamada adequately alleges an adverse employment action to survive Defendant's motion to dismiss.  Hamada states that he was Co-Chair of the Self-Study Committee, was removed from that position and the committee, was relegated to a "support role" for the committee, and finally was subsequently eliminated from all email correspondence regarding the committee.  Compl. ¶¶ 18, 30, 42.  Hamada argues that his removal from the committee constituted a change in his employment conditions and materially affected his pursuit of tenure, as successful tenure in part depends on one's leadership in service to the institution and "[c]hairing a committee is a common way to satisfy one's leadership service to an institution."  *Id.* ¶ 15.

To be sure, removal from university committees alone is generally insufficient to constitute an adverse employment action.  *See Watkins v. City of Waterbury Bd. of Educ.*, No. 19-cv-593 (SVN), 2022 WL 3347218, at *16 (D. Conn., Aug. 12, 2022) ("removal from committees and exclusion from meetings, without more, are not adverse employment actions for purposes of Title VII discrimination claims); *see also Jaggon v. Cmty. Health Services, Inc.*, No. 18-cv-458 (JCH), 2019 WL 4414953, at *5 (D. Conn. Sept. 16, 2019) (granting summary judgment against plaintiff's discrimination claim because plaintiff "presented no evidence upon which a

reasonable jury could find that his removal from [two] committees" in his work as nurse at a health center "constituted a materially adverse change" (internal quotation marks omitted)); *Chung v. City Univ. of N.Y.*, No. 14-cv-3611, 605 F. App'x 20, 23 (2d Cir. Mar. 31, 2015) (summary order) (holding that plaintiff failed to allege adverse employment action where allegations included exclusion from seven meetings).

Hamada, however, alleges more than mere removal from a committee or exclusion from meetings. He instead alleges removal from a leadership position in a committee, followed by full exclusion from electronic communications regarding the committee. Compl. ¶¶ 30, 42. He further alleges that the removal from the leadership position affected his advancement prospects due to his anticipated pursuit of tenure. *Id.* ¶ 30. "[D]enials of workplace opportunities that affect the terms and conditions of employment can . . . qualify as an adverse employment action" even where those opportunities would not "involve a material increase in pay." *Buon*, 65 F.4th at 80–81. Furthermore, "the denial of a lateral transfer or an additional assignment can qualify as an adverse employment action if that transfer or additional assignment would have materially changed the terms and conditions of employment, such as by materially increasing the employee's pay or materially increasing the employee's opportunity for advancement." *Id.* at 82. Under the reasonable inferences Hamada is due at the motion to dismiss stage, Hamada has sufficiently pled an adverse employment action, specifically because he has alleged enough to infer that his leadership position on the committee could have "materially increas[ed] [his] opportunity for advancement." *Id.*

7

Defendant argues that Hamada's argument about tenure does not hold because he had not yet actually applied for tenure, but Defendant's argument is unavailing. Defendant cites *Shafer v. American University in Cairo*, No. 12-cv-9439 (VEC), 2014 WL 3767007, at *11 n.30 (S.D.N.Y. July 31, 2014). Def.'s Mem. in Support of Mot. to Dismiss ("Def.'s Mem.") 18, ECF No. 13. In that case, the plaintiff specifically identified the fact that she was not offered tenure as one of the adverse employment actions taken against her. 2014 WL 3767007, at *11. The *Shafer* court noted that the plaintiff "was not granted tenure, but she has pointed to no one who was granted tenure without applying." *Id.* Furthermore, the *Shafer* plaintiff sought, unsuccessfully, to alter the tenure application process for herself. *Id.* at *7. The *Shafer* court's statement that "Shafer fails to establish a *prima facie* case as to her tenure claim because she did not apply for tenure" does not constitute a holding that plaintiffs cannot describe the impact on future tenure applications when alleging other adverse employment actions. *Id.* at *11, n.30. The adverse employment actions evident in Hamada's pleading — removal from the leadership position of a committee, and ultimately full removal from the committee — are actual changes that he experienced. That is, he was a co-chair of the committee and then removed from that role and from the committee. Hamada's assertion that his removal adversely impacted his prospects for tenure supports his claim that it was to the detriment of his "opportunity for advancement" at the university; that is so regardless of whether he had already begun the tenure application process at the time he was removed from his committee leadership position. *Buon*, 65 F.4th at 82.

8

### b. Motivated by discriminatory intent

Hamada has also provided enough support, at the motion to dismiss stage, for the proposition that his employer was motivated by discriminatory intent.

As Defendant notes, Hamada's supervisor Jill O'Sullivan did not make the national origin, ethnicity, and gender comments in Hamada's pleadings; instead, those comments were made by Hamada's peer Zhao. Def.'s Mem. at 15. Defendant argues that O'Sullivan did not know of Zhao's comments at the time she initially removed Hamada from his leadership role of the committee. *Id.* at 15, n.4. But Zhao's comments referring to Hamada's national origin, ethnicity, and sex, are not his only path to sufficiently pleading a reasonable inference of discriminatory intent at the motion to dismiss stage. Instead, "[a]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn*, 795 F.3d at 312–13. "The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis, including at the pleading stage." *Id.* at 313.

While Hamada was not terminated from his academic position and replaced by Zhao as an employee of SUNY at Farmingdale, his removal as co-chair of the committee effectively replaced him as a co-leader of the committee with Zhao as the sole leader of the committee. From Hamada's pleadings, the Court infers that Zhao was similarly situated to him; they were employed "in equivalent tenure-track positions" and were "peer[s]." Compl. ¶¶ 13, 14. In fact, Zhao was hired a year after

Hamada began working at SUNY Farmingdale.  *Id.* ¶¶ 12, 13.  Throughout the Complaint, Hamada alleges disparate treatment by O'Sullivan compared to Zhao. Thus, he has offered the required "minimal support for the proposition that the employer was motivated by discriminatory intent" for this stage of the litigation. *Buon*, 65 F.4th at 79 (quoting *Littlejohn,* 795 F.3d at 311).

In support of Defendant's argument that Hamada has not pled discriminatory intent, Defendant states that Zhao's comments about Hamada's national origin, ethnicity, and sex came *after* the adverse employment action Hamada alleges, and that Hamada has not pled that O'Sullivan was aware of those comments when she decided to remove him as co-chair.  Def. Mem. at 15, n.4.  However, one of Zhao's comments occurred before Hamada's meetings with O'Sullivan, and Hamada argues that in his first meeting with O'Sullivan in April, he "expressed his dissatisfaction with the way he was being treated."  Compl. ¶ 20; Pl. Opp. at 11.  Furthermore, the Complaint alleges that O'Sullivan's removal of Hamada from all email communications regarding the committee occurred after Hamada reported Zhao's comments to the Dean of the School of Business and to the university's human resources department.  Compl. ¶¶ 38–39, 41–42.  Thus, a factfinder could reasonably infer from the Complaint that O'Sullivan was aware of Hamada's allegations of Zhao's discriminatory animus when she removed Hamada as co-chair of the committee and later from all email communications regarding the committee.  In any event, and as discussed above, Hamada has pled enough to show disparate treatment between himself and Zhao regarding co-chairpersonship of the committee, regardless of

O'Sullivan's awareness of Zhao's comments on Hamada's national origin, ethnicity, and sex.

Hamada further argues that Zhao's discriminatory animus toward him — even if it was not shared by O'Sullivan — can be imputed to Zhao and Defendant under the "cat's paw theory" of liability.  Under the "cat's paw theory" of liability, the intent of an employer's agent can be imputed to the employer, who themselves may not have had discriminatory intent, where the employer effected the adverse employment action and "was negligent because it acted at the agent's behest when it knew or should have known of the agent's discriminatory motivation." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 37–38 (2d Cir. 2019).  The Second Circuit has held that the "agent" whose discriminatory intent can be imputed to the employer does not have to be a supervisor and can be a plaintiff's co-worker or a "low-level employee with no decisionmaking authority."  *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273–76 (2d Cir. 2016) (holding that plaintiff pled sufficient facts for a reasonable person to infer that employer negligently relied on co-worker's retaliatory and discriminatory accusations in effecting adverse employment action).

Employing the "cat's paw theory" of liability for Title VII claims here permits Hamada's Title VII discrimination claim to survive Defendant's motion to dismiss.  The reasonable inference from Hamada's Complaint, in the light most favorable to Hamada as the nonmovant, is that Zhao's efforts to remove him from the committee were motivated by discriminatory intent — evidenced by her comments about Hamada's sex, national origin, and ethnicity.  When Zhao stormed out of a committee

meeting after stating, "I'm going to kick you out of th[is] Committee!" and spoke with O'Sullivan, Hamada alleges O'Sullivan "credited Zhao's story" and "did so without consulting Dr. Hamada or the other committee members," making "no effort to hear both sides of the story." Compl. ¶¶ 26, 28. Later, in the meeting O'Sullivan convened after Hamada's emergency room visit, Hamada alleges O'Sullivan "made a show of getting Dr. Hamada's perspective," "discounted and disregarded everything Dr. Hamada said," that "[h]er mind was already made up and could not be changed," and that "[s]he stood by her decision to remove Dr. Hamada from the Committee and make Zhao the sole chairperson." *Id.* ¶ 33. Drawing every reasonable inference in favor of Hamada, as this Court must at the motion to dismiss stage, the Complaint sufficiently alleges that Zhao was motivated by discriminatory intent and that O'Sullivan was negligent in failing to follow a proper and fair investigation into Zhao's complaints before removing Hamada from the committee.

This result is grounded in Second Circuit decisions applying the "cat's paw theory" to find that a failure to properly investigate or interview relevant individuals can contribute to a finding of negligence on part of the employer under Title VII. *See e.g. Menaker*, 935 F.3d at 34–35 (private university failed to interview relevant witnesses, senior university official knew one accusation against plaintiff was false, plaintiff never received investigation report, and university disregarded its own harassment policy); *see also Vasquez*, 835 F.3d at 276 (employer credited co-worker's cross-allegations and purported text messages from plaintiff, "obstinately refusing to inspect [plaintiff's] phone or to receive any other evidence proffered by [plaintiff] in

refutation").  Here, while O'Sullivan met with Hamada, Hamada alleges she "made a show of getting Dr. Hamada's perspective" and did not interview other committee members to corroborate Zhao's allegations.  Compl. ¶¶ 28, 33.  Though Hamada's Complaint does not describe Defendant's typical investigation process for removing someone from a leadership role in a committee, it would be reasonable to infer that Defendant's process involved interviewing relevant individuals who observed his behavior in the committee, or, at minimum, considering Hamada's perspective on the events that unfolded.  Thus, Hamada has sufficiently pled under the "cat's paw theory" of liability that Defendant negligently relied on Zhao's discriminatory intent to effect its adverse employment action against Hamada.

## II.    Hamada has sufficiently pled a retaliation claim under Title VII

To establish a presumption of retaliation at the initial stage of Title VII litigation, a plaintiff "must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Littlejohn*, 795 F.3d at 315–16 (quoting *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir. 2010)).  In that analysis, as with the analysis regarding the Title VII discrimination complaint, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise . . . in the initial phase of a Title VII litigation." *Id*. at 316.

### a. Participation in a protected activity

For the first prong of the retaliation inquiry, Hamada pleads that after Zhao made a negative comment that explicitly referenced the "culture" of "male[s] from the Middle East," he met with O'Sullivan and complained about his treatment by Zhao. Compl. ¶¶ 20, 33; Pl. Opp. at 11 ("Plaintiff expressed his dissatisfaction with the way he was being treated at the April 30, 2021, meeting with O'Sullivan."). Zhao subsequently made an additional negative comment about Hamada being "male" and of "Middle Eastern culture." Compl. ¶ 36. Hamada reported Zhao's comments to Dean of the School of Business Richard Vogel, and to O'Sullivan, and on that same day, O'Sullivan reaffirmed her decision to remove Hamada as co-chairperson of the committee. *Id.* ¶¶ 38, 41. Hamada further pleads that on May 13, 2021, he reported his complaints to the university's HR department. *Id.* ¶ 39. He asserts that in retaliation for making that report, O'Sullivan "removed Plaintiff from all email communications regarding the committee which further impacted his ability to do his job." *Id.* ¶ 42.

Hamada's complaints to O'Sullivan, Vogel, and the university's human resources department qualify as protected activities under the "opposition clause" in Title VII. 42 U.S.C. § 2000e-3(a) (providing that it is "unlawful . . . for an employer to discriminate against any . . . employee[] . . . because he has opposed any practice made . . . unlawful . . . by this subchapter"); *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment

14

discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." (internal quotation marks omitted)); *see Correa v. Mana Products, Inc.*, 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008) (noting opposition clause protected activities "can include informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry, and expressing support of co-workers who have filed formal charges"). Thus, Hamada has adequately pled his participation in a protected activity.

### b. Defendant knowledge of protected activity

For the second prong of the retaliation inquiry, by alleging that O'Sullivan removed him from emails regarding the committee as retaliation for his complaint to the human resources department, Dr. Hamada clearly implies — giving his Complaint all reasonable inferences in Plaintiff's favor — that O'Sullivan knew of his HR complaint. Compl. ¶¶ 42–43. Thus, based on that allegation alone, Hamada sufficiently pleads that Defendant had knowledge of at least one of the protected activities in his Complaint.

Furthermore, the Complaint alleges that O'Sullivan made final her decision to remove Hamada as co-chairperson after hearing Hamada's complaints about how he was being treated in the virtual meeting with Zhao. Hamada also states that he "expressed his dissatisfaction with the way he was being treated at the [earlier] April 30, 2021, meeting with O'Sullivan," in which Zhao did not show. Pl. Opp. at 11. Though the Complaint does not explicitly state that Hamada, when complaining to

O'Sullivan in either meeting about "how he was being treated," specifically alleged discriminatory treatment, that is a reasonable inference from the facts and chronology Hamada has pled.  The Complaint makes clear that one of Zhao's allegedly discriminatory comments occurred before the April meeting — "You are a male from the Middle East, and I know this culture very well."  Compl. ¶ 20.  Thus, Hamada has also sufficiently pled, for this stage of the litigation, that he protested discriminatory treatment to O'Sullivan and that she therefore had knowledge of an additional protected activity.

To be sure, the Complaint is not explicit about whether O'Sullivan made final her decision to remove Hamada as co-chairperson of the committee before or after he complained about Zhao's comments to Dean Vogel, which occurred on the same day (May 11, 2011).  Nevertheless, as discussed above, Hamada has sufficiently pled that O'Sullivan had knowledge of at least two protected activities and therefore satisfies the second prong of his Title VII retaliation claim.

### c.  Adverse action

For the third prong of the retaliation inquiry, the Supreme Court has held that the "materially adverse action" that must be shown for a Title VII retaliation claim is distinct from the "adverse employment action" that must be shown for a discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64 (2006).  In *White*, the Court clarified that Title VII's antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment."  *Id.*  Instead, a plaintiff must show a "materially adverse" action,

"which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

Hamada has sufficiently pled that he experienced a "materially adverse action" that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted). Though Hamada's Complaint does not detail what he said in the two meetings convened by O'Sullivan, he makes clear that he "expressed his dissatisfaction with the way he was being treated" in the April 2021 meeting and that O'Sullivan "discounted and disregarded everything Dr. Hamada said" in the May 2021 virtual meeting attended by O'Sullivan, Zhao, and Hamada.  Pl. Opp. at 11; Compl. ¶ 33.  In response, according to Hamada, O'Sullivan told him "[i]f you go to the Dean with this issue, I will never, ever put you on a committee again" and re-affirmed her decision to remove him from the committee.  Compl. ¶¶ 33, 34.  Furthermore, on the same day Hamada reported his complaints to the university's HR department, O'Sullivan removed him from all email communications regarding the committee, which he alleges was "an act of retaliation caused by Plaintiff's discrimination complaint" lodged that day.  *Id.* ¶ 43. O'Sullivan's decision to remove Hamada from his leadership position on the committee, her instruction that Hamada would never be put on a committee again if he went to the Dean with his complaints, and her decision to remove him from all email communications regarding the committee after Hamada complained to HR, are each adverse actions that could dissuade a reasonable employee from making or supporting a charge of discrimination, where, as Hamada alleges, such removal could

significantly impair that employee's chances of tenure.  *See Shafer*, 2014 WL 3767007, at *16 (denying motion to dismiss plaintiff's Title VII retaliation claim and finding as materially adverse actions the recording of a faculty meeting after plaintiff lodged her complaint and removal from faculty committees, where plaintiff's service duties were considered one third of her tenure portfolio).

Defendant seeks to distinguish *Shafer*'s holding by stating that Hamada's "removal from the Committee preceded any protected activity, so no retaliation claim has been stated."  Def. Mem. at 18 n.5.  It is true that Hamada alleges that he was removed from his co-chairmanship of the committee, and possibly from the committee altogether, on May 2, 2021.  Compl. ¶¶ 30–32.  However, a reasonable inference from the Complaint is that O'Sullivan reconsidered her decision in the virtual meeting that took place after Hamada's visit to the emergency room.  *Id.* ¶ 33 ("Although O'Sullivan made a show of getting Dr. Hamada's perspective, she discounted and disregarded everything Dr. Hamada said.  Her mind was already made up and could not be changed.  She stood by her decision to remove Dr. Hamada from the Committee.").  Moreover, later in the Complaint, Hamada alleges that "[o]n or about May 11, 2021[], O'Sullivan removed [him] as co-chair of the committee."  *Id.* ¶ 41.  Thus, Hamada has plausibly alleged that no final decision to remove him as co-chairperson of the committee was made until May 11, 2021, by which time he had purportedly informed O'Sullivan of his own complaints about how he was being treated, and on which day he also reported Zhao's comments on his national origin, ethnicity, and sex to Dean Vogel.  *Id.* ¶¶ 38, 41; Pl. Opp. at 12–13.    Moreover,

O'Sullivan removed Hamada from all email communications regarding the committee on May 13, 2021, after he made his complaints to the HR department.  Compl. ¶¶ 39, 42–43.

### d. Causal connection between protected activity and adverse action

For the fourth prong, Hamada has sufficiently pled a causal connection between the protected activity and the adverse employment action.  Such a causal connection can be demonstrated either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  In *Littlejohn*, the Second Circuit found that a plaintiff sufficiently pled facts that would indirectly establish causation to survive the motion to dismiss stage, because the plaintiff's "allegations that the [adverse employment action] occurred within days after her complaints of discrimination [were] sufficient to plausibly support an indirect inference of causation." *Id.* at 319–20.  Here, at least two adverse employment actions Hamada alleges occurred on the same days that he made his complaints, which is sufficient to plausibly support an indirect inference of causation at the motion to dismiss stage.

19

### III. Hamada has failed to state a hostile work environment claim under Title VII

Hamada's complaint, even with all reasonable inferences drawn in his favor, does not sufficiently plead a plausible hostile work environment claim.

To establish a hostile work environment under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). There are "both objective and subjective components" to the standard for establishing a hostile work environment: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). Courts "must consider the totality of the circumstances" in the inquiry, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* When discriminatory comments are at issue, a plaintiff who, for example, alleges "multiple comments" that involve "a particularly demeaning and offensive slur" has plausibly alleged a hostile work environment claim. *See Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 470

(S.D.N.Y. 2017) (holding plaintiff plausibly pled hostile work environment where plaintiff alleged "that there were 'multiple comments' about employees 'not "fitting the image of the store" or referring to them as "monkeys"'").

While "isolated incidents of harassment ordinarily do not rise to this level," the Second Circuit has recognized that "a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace." *Banks v. General Motors, LLC*, 81 F.4th 242, 262 (2d Cir. 2023) (internal quotation marks omitted) (holding that a reasonable jury could find that a single event in which employer yelled at plaintiff in an aggressive manner audible to people 50 feet away, alarming other colleagues, and leading one colleague to think plaintiff required physical protection from altercation could constitute hostile workplace environment).

Hamada has sufficiently alleged that he *subjectively* believed his workplace environment to be abusive. He has not, however, sufficiently pled facts that rise to the threshold of a work environment that an *objectively* reasonable worker would find hostile or abusive under the test that governs Title VII claims.

Hamada points to Zhao's "clear statements of discrimination that touched upon his protected classes of gender and national origin," and Zhao's conversation with O'Sullivan which "caused his removal" from the committee. Pl. Opp. at 17. In his Complaint, Hamada alleges that Zhao "spoke down to him constantly" and once stated "I'm going to kick you out of this Committee!". Compl. ¶¶ 25–26. O'Sullivan removed Hamada from the co-chairperson role, warned him not to go to the Dean, and ultimately removed him from all email communications regarding the committee.

*Id.* ¶¶ 34, 42.  Subsequently, Hamada alleges, O'Sullivan "refus[ed] to complete [his] annual report unless he agreed to remove the Cyber Advising Committee entry, refus[ed] to approve an online course he developed that already had approval from Distance Learning, and communicat[ed] with Dr. Hamada in a harsh, hostile, and inappropriately critical manner." *Id.* ¶ 45.

Hamada has not pled facts that lead to an inference that O'Sullivan's insistence he remove the Cyber Advising Committee entry from his annual report and refusal to approve an online course he developed were discriminatory in nature. Furthermore, the comments Hamada alleges Zhao made — about Hamada's "Middle Eastern culture" and the "macho thing" and "power struggle" Zhao associated with males in that culture — occurred on two occasions and did not involve "a particularly demeaning and offensive slur." *Id.* ¶ 36; *Green*, 248 F. Supp. 3d at 470.  Zhao's comments, on either of the two occasions alleged, do not rise to the severity of the kind of "single act [that] can create a hostile work environment" on its own by "work[ing] a transformation of the plaintiff's workplace." *Banks*, 81 F.4th at 262; *See* Compl. ¶¶ 20, 36.  Even assuming that Hamada is correct that all the facts he cites could reasonably be viewed as discriminatory, his allegations, under the totality of the circumstances, do not survive the threshold for being so "severe or pervasive" as to "create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21.

Factual allegations that have been found sufficient to state a claim for a hostile workplace environment involve far greater severity and/or frequency than those alleged by Hamada.  *See Petrosino v. Bell Atl.*, 385 F.3d 210, 223–24 (2d Cir. 2004)

22

(reversing summary judgment against plaintiff's hostile work environment claim where plaintiff alleged "persistent sexually offensive remarks," sexually crude "graffiti at outdoor work sites," a "sexual assault by a drunken co-worker," that male co-workers used sexual assault as "subject for office jokes and graffiti," that male co-workers gave "sarcastic apologies" when plaintiff attempted to limit their sexually offensive exchanges, and "vulgar references" by male coworkers of plaintiff's "breasts and menstrual cycle"); *Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 538 (S.D.N.Y. 2008) (denying summary judgment against plaintiff's hostile work environment claim where plaintiff alleged supervisor physically assaulted him at least twice, made derogatory comments about plaintiff's sexual orientation "many times," and remarked on plaintiff's age "several times").

By contrast, courts have dismissed hostile work environment claims for conduct similar to, or more pervasive than, the conduct Hamada alleges. *See Littlejohn*, 795 F.3d at 321 (plaintiff alleged supervisor "made negative statements" about plaintiff to another, "was impatient and used harsh tones" with plaintiff, "distanced herself from [plaintiff] when she was nearby," "declined to meet with [plaintiff]," "replaced [plaintiff] at meetings," "wrongfully reprimanded [plaintiff]," "increased [plaintiff's] reporting schedule," made a sarcastic comment to plaintiff, and told plaintiff she did not "understand the culture" at the employing agency); *Mira v. Argus Media*, No. 15-cv-9990 (RJS), 2017 WL 1184302, at *6 (S.D.N.Y. Mar. 29, 2017) (plaintiff alleged coworkers "became more guarded and reserved around her" and "made remarks . . . that she took to be allusions to her personal life and private

conversations," one coworker once spoke to her in a "highly personal, sexualized voice tone," another coworker said, audible to plaintiff, that another employee's ancestors had a role in "driving Mexicans out of Texas").

Thus, under the totality of the circumstances, Hamada has failed to adequately plead a hostile work environment claim under Title VII.

## IV.    Hamada has failed to state a constructive discharge claim

Hamada appears to allege that he was constructively discharged.  Compl. ¶ 67. He does not, however, defend that claim in his opposition to the motion to dismiss. In any event, any constructive discharge claim in Hamada's papers should be dismissed.  "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign," which is "higher than the standard for establishing a hostile work environment." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (internal quotation marks omitted) (affirming summary judgment against plaintiff's hostile work environment and constructive discharge claims).  Because Hamada "failed to establish a hostile work environment, [his] claim of constructive discharge also fails." *Id.; see also Antrobus v. N.Y.C. Health & Hospitals Corp.*, 2023 WL 6784414, at *3 (2d Cir. Oct. 13, 2023) (summary order) (affirming dismissal of appellant's hostile work environment and constructive discharge claims and finding that "[a]ppellant's failure to state a claim for hostile work environment necessarily renders her constructive discharge claim —

which is predicated on the same allegations as the hostile work environment claim —

unsuccessful").

## CONCLUSION

For the reasons discussed above, the Court grants Defendant's motion to dismiss in part and denies it in part. Hamada has sufficiently pled claims under Title VII for discrimination and retaliation. Defendant's motion to dismiss is granted as to Hamada's Title VII hostile work environment and constructive discharge claims.

In light of the partial grant of Defendant's motion to dismiss, the Court grants Hamada leave to amend his complaint. "The court should freely give leave [to amend] when justice so requires," (Fed. R. Civ. P. 15(a)), and "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Davidson v. Cnty. of Nassau*, 18-cv-1182 (GRB), 2020 WL 956887, at *4 (E.D.N.Y. Feb. 26, 2020) (internal quotation marks omitted). Leave to amend a complaint should not be denied unless there is evidence of "undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

While Defendant argues that Hamada had notice of Defendant's arguments through the pre-motion conference letter Defendant filed prior to the instant motion to dismiss, this Court held that a pre-motion conference was unnecessary and ordered a briefing schedule on the instant motion. Def.'s Reply in Support of Mot. to Dismiss 16–17, ECF No. 15; Docket Order dated Feb. 28, 2024. Thus, while Hamada may have been aware of arguments Defendant planned to raise in the instant motion as

to deficiencies in Hamada's pleading, the decision here is the first occasion in which Hamada has been informed by the Court that his pleading is insufficient on certain claims.  The Court therefore concludes that Plaintiff has not shown "undue delay [or] bad faith" by failing to amend prior to Defendant's filing of its motion to dismiss. Because the Court finds that no other factors for denying leave to amend are present, it grants Hamada leave to amend his Complaint.  If Hamada wishes to amend his Complaint, he shall do so no later than 30 days from the date of this Order.


        SO ORDERED.


                                                        /s/ Nina R. Morrison
                                                        NINA R. MORRISON
                                                        United States District Judge


Dated:          March 25, 2025
                Brooklyn, New York

26